JOHN D. WILLIS et al., Appellants, v. LESLEY P. ROBINSON et al.

JOHN D. WILLIS et al., Appellants, v. WILLIAM A. ALLEN et al.

JOHN D. WILLIS et al., Appellants, v. COLUMBUS D. THOMPSON et al.

In Banc, February 9, 1922.

1. **CONVEYANCE: Interpretation: Technical Words: Knowledge of Draftsman.** A cardinal rule of interpretation is to look to the instrument itself for an ascertainment of its meaning, and in the application of the rule, if the deed bears on its face evidence of lack of knowledge on the part of the draftsman of the recognized use and well defined meaning of any words employed therein, their unskillful source and inaccurate use will be recognized, and if possible such a construction will be given to the entire instrument as will best effect the dominant purpose of the maker.

Willis v. Robinson.

2. ——: ——: **As a Whole: Constituent Parts.** The ancient horn-book law that the component parts of a deed were the premises, the *habendum*, the *tenendum*, the *reddendum*, the warranty and the *testimonium*, has in modern jurisprudence yielded to the rule that the necessary constituents of a valid deed are the names of competent parties, the consideration, a description of the property, the interest or quantity conveyed, the conditions, reservations and covenants, if any there be, and a formal execution and delivery; and the entire instrument is so to be construed as to cause form to yield to the evident intention or purpose of the maker.

3. ——: ——: ——: **Different Clauses: Inconsistent and Absurd Results.** The interpretation of the different clauses and provisions of a deed separately and by piecemeal, and in such a way as to result in inconsistencies, contradictions and absurdities, is not the correct method.

4. ——: ——: ——: **Cotenancy: Fee: Life Estate: Remainders: Limitations: Merger: Heirs Means Children.** In 1866 the owner of land conveyed it to Henry and William, by a deed which in its first clause was a grant of the fee, but by subsequent clauses: "To the said Henry until the said William shall be of lawful age, or until his death, if he shall die before the said William. And to the said William for and during his natural life, and in case said William should die a minor, the said Henry, if he survives him, shall have the free and undisturbed use of the hereby conveyed premises for and during his natural life. The intent and purpose of this conveyance being to vest a life estate in and to said premises, partly in the said Henry and partly in the said William, and the remainder of the estate in the heirs of the said William, or their heirs and assigns of such heirs forever. To have and to hold said premises to the said Henry and William as above mentioned, and the residue, remainder and reversions therein and thereof to the heirs of the same respectively and their heirs and assigns of such heirs forever." *Held*, first, that to consider the various clauses of the deed separately and by piecemeal would lead to inconsistencies, and possible absurdities; *second*, when the deed is considered as a whole, the intention of the grantor is plain enough, and notwithstanding the misuse of words and inaccuracies of expression, that intention was to vest a life estate partly in Henry and partly in William, and the remainder in the heirs of Henry and the heirs of William; *third*, the seeming fee created by the granting clause was reduced to a life estate in the two grantees, with remainder over in fee to their heirs; *fourth*, the clause reading "to the said Henry until the said William shall be of lawful age," when read in connection with the

clause expressing the grantor's intention, must be construed to have created a life estate in Henry, with a right reserved in him to the exclusive use of the premises until William reached his majority; *fifth*, notwithstanding the clause "to said Henry, until the said William shall be of lawful age, or until his death, if he shall die before the said William" and the fact that Henry died in 1898 and William in 1918, the children of said Henry took an undivided half interest in said land in fee, and the children of William the other undivided half in fee; and, *sixth*, the estates being inseparable except by judicial action and there being no such partition, the Statute of Limitations did not begin to run against the children of Henry until the death of William.

*Held*, by JAMES T. BLAIR, C. J., concurring, with whom GRAVES and HIGBEE, JJ., concur, *first*, that since the first clause of the deed, standing alone, conveys the fee to Henry and William as tenants in common, the next clause "to the said Henry until the said William shall be of lawful age, or until his death, if he shall die before the said William" did not convey an estate to Henry which terminated upon Henry's death, leaving the whole estate to William; *second*, the language of said second clause did not deal with the whole estate, but fixed a definite term, with a definite end, during which Henry was given the use of all the land, defeasible upon the condition that William reached his majority, and therefore this clause, when read in connection with the succeeding ones, carved out of the fee what may be called a defeasible term for years and certain contingent life estates, and deals with nothing more, and in no respect attempts to dispose of the remainder or remainders; *third*, by the third clause "to the said William for and during his natural life, and in case the said William shall die as a minor, the said Henry, if he survives him, shall have the free and undisturbed use of the hereby conveyed premises for and during his natural life," taken in connection with the second clause and with the first clause conveying the fee, a life estate was given alternately to Henry and William, but not jointly at any time, and the right of each was conditional, but when the condition arose, exclusive, but no disposition of the remainders had been made by said three clauses; *fourth*, the word "heirs" in the fourth clause stating that the purpose of the deed was to vest a life estate partly in Henry and partly in William and "the remainder of said estate in the heirs of said Henry or the heirs of the said William, or their heirs and assigns of said heirs forever," since the said William was illegitimate and then eleven years of age, meant his children, and since it is not reasonable to suppose that the word would have been used in a different

sense in the same sentence it also meant the children of Henry; *fifth*, if the fee went to Henry's heirs if William died a minor and Henry survived him and Henry then took a life estate, and went to William's heirs in case he attained his majority and took a life estate, then the words at the end of said fourth clause "or their heirs and assigns of such heirs forever" are wholly superfluous and never could have had anything upon which to operate, but said words mean that the remainder was to go to Henry's children if William died without surviving children, and to the children of William if Henry died without surviving children, and to the heirs, half and half, of Henry and William if both died leaving surviving children; *sixth*, when said fourth clause is read in connection with the three subsequent ones and the three which precede it, the whole deed shows an intention to convey life estates or less estates to Henry and William, defeasible upon condition, and the remainder in fee to their children and their heirs, and as the conditions never happened, the children of Henry upon his death in 1898 took an undivided half in fee, and the children of William upon his death in 1918 took the other half in fee; and, *seventh*, the Statute of Limitations could not run against the children of Henry during the life tenancy of William, and no merger of the fee and life estate of William was effected by a deed executed by Henry to his children.

*Held*, by DAVID E. BLAIR, J., dissenting, *first*, that, considering the deed as a whole, it conveyed to Henry an estate conditionally limited in duration to the minority of William, subject to termination sooner in the event that Henry died before William reached his majority; *second*, in the event William died before reaching his majority and Henry was then living, Henry took a life estate, with the remainder over in fee to the heirs of Henry; *third*, in the event William reached his majority or Henry died prior to that time, William took a life estate, with vested remainder in fee in William's heirs; *fourth*, both Henry and William having died, the remainder in fee did not go half to the heirs of Henry and half to the heirs of William, but Henry having died before William the entire remainder in fee went to William's heirs; *fifth*, the clause "to the said Henry, until the said William shall be of lawful age, or until his death, if he shall die before the said William" conveyed an estate to Henry until William arrived at his majority, and fixed its termination at said date, and the life estate then vested in William and the remainder in fee in his heirs; that unless such construction is adopted, no meaning whatever can be given to the words

of the next clause that "in case the said William shall die as a minor, the said Henry, if he survives him, shall have the free and undisturbed use of the hereby conveyed premises for and during his natural life," for if Henry took a life estate at all it commenced at the termination of his estate for a term of years upon the death of William before reaching lawful age; that such is the correct construction is further evidenced by the succeeding clauses wherein alternate provisions are made by the use of the words "or" and "respectively," showing that when once the life estate of William vested, both Henry and his heirs lost all further title and interest in the land; *sixth*, the only contingency which would extend the estate of Henry for a term of years into a life estate with remainder in his heirs being the death of William "as a minor," and said contingency not having occurred, William when he reached his majority took a life estate and his heirs a vested remainder in fee in all the lands; and, *seventh*, the deed expressly saying its intent and purpose was to vest a life estate partly in Henry and partly in William, this conclusively shows that nothing more than a life estate was ever intended to be vested in either Henry or William, and completely destroys the suggestion that the first clause conveyed the fee to them as tenants in common, out of which were further on carved an estate for years in Henry, a subsequent estate for life in William, if he attained lawful age, and, after the termination of the life estate, remainder in fee in the heirs of the cotenants.

5. ———: ———: **Use of Or for And.** Where the deed conveyed a life estate to Henry and William and vested "the remainder of said estate in the heirs of the said Henry or the heirs of the said William, or their heirs and assigns of such heirs forever," not much importance is to be attached to the first use of the word "or"; but, in the presence of a purpose otherwise clearly defined, its use is to be regarded as a mistake, and as an inadvertent use of "or" for "and." And the use of the word the second time in the phrase "or their heirs and assigns of such heirs forever" strengthens the view that by the preceding phrases a grant to the heirs of both Henry and William was meant.

*Held*, by JAMES T. BLAIR, C. J., concurring, with whom GRAVES and HIGBEE, JJ., concur, that the meaning of the words "or their heirs and assigns of such heirs forever" being that the remainder in fee was to go to the children of Henry if William died without surviving children, and to the children of William if Henry died without surviving children, and to the heirs, half and half, of Henry and William if both died leav-

Willis v. Robinson.

ing surviving children, those words explain the use of the
disjunctive word "or."

6. ———: ———: **The Word Respectively.** Where the *habendum*
was "to have and to hold said premises to the said Henry and
William as above mentioned, and the residue, remainder and re-
versions therein and thereof to the heirs of the same respectively
and their heirs and assigns of such heirs forever," the word "re-
spectively" does not mean that "one set of the heirs may be set
over against the other," but does mean "as relating to each" or
"as each refers or belongs to each in their order."

*Held,* by JAMES T. BLAIR, C. J., with whom GRAVES and HIG-
BEE, JJ., concur, that the word "respectively" used in said
connection does not mean "alternately" or "successively," and
to construe it as meaning a succession of the remainder to
the heirs, first of Henry and then of William, or *vice versa,*
would be to adopt a construction wholly out of harmony -with
the language of the preceding clauses of the deed. ·

*Held,* by DAVID E. BLAIR, J., dissenting, that the preceding
clauses of the deed conveyed a life estate to William with
contingent remainder in fee in his heirs, subject to be de-
feated by the death of William during the lifetime of Henry,
in which event the title would vest in Henry for life with re-
mainder in the heirs of Henry, and this alternate succession
is further evidenced by the language of this succeeding clause
wherein alternate provisions are made by the use of the words
"or" and "respectively."

7. ———: ———: **Explained by Covenant and Clause Relinquishing
Dower.** What the grantor and his wife meant by certain phrases
contained in a deed conveying land to two grantees may be ex-
plained by the use of kindred words in the covenant and in the
clause by which the wife relinquishes her dower. Where the deed
contains a clause stating that its intention is to vest a life estate
in Henry and William and "the remainder of said estate in the
heirs of the said Henry or the heirs of the said William, or their
heirs and assigns of such heirs forever," a covenant "with the
said Henry and William, their heirs and assigns of such heirs"
that the grantors are lawfully seized, and a relinquishment by the
grantor's wife of her dower "to the said Henry and William, their
heirs and assigns of such heirs forever," serve to make it clear
that the remaindermen are the heirs of both Henry and William.

8. ———: ———: **Extrinsic Evidence.** Where the meaning of a
deed is manifest from its face, there is no ground for determining
its meaning by ascertaining the situation and circumstances of
the parties. But if the meaning of a deed can be shown by the

construction given it by the grantees, the facts of this case do not show a meaning contrary to the intention manifested by the language of the instrument itself.

9. ——: ——: **Acts of Possession.** Oral statements of parties in interest characterizing the possession are never admissible to show title, and have no application in the presence of the unequivocal terms of their deed.

10. **LIMITATIONS: Life Estate: Tenants in Common.** Where a deed conveyed a life estate to two grantees and the remainder in fee to their heirs, the interests of the life tenants being undivided and severable only by judicial action, which did not occur, the Statute of Limitations did not begin to run against the children of one of them upon his death in 1898, nor did it begin to run against them until the death of the other life tenant in 1918.

11. ——: ——: ——: **Conveyance by Life Tenant.** Remaindermen are not entitled to possession of land until the life estate terminates, and neither the life tenant nor his grantee can claim adversely to the remaindermen, and the Statute of Limitations does not run against them until the death of the life tenant, nor will the remainderman be relieved of his disability to recover possession during the pendency of the life estate by an attempted conveyance by the life tenant and a claim of a fee by his grantees.

12. **LACHES: Action at Law.** In an action of ejectment and to quiet title, wherein defendant stands on his legal title, the doctrine of laches has no place in the determination of the matters at issue. In an action at law, in which there is no claim or defense in equity, laches is not applicable.

13. **MERGER: Conveyance by One Life Tenant to Remaindermen.** Where the land was conveyed to Henry and William for life and the remainder to their heirs, and Henry conveyed his estate to his heirs, there was no merger of the life estate with the fee during the life of William. To constitute merger the entire estates, and not a part of them, must coalesce.

14. **APPELLATE PRACTICE: Law Case: Finding of Facts: Construction of Deed.** The rule that a finding of facts by the trial court, sitting as a jury in a law case, if supported by substantial evidence, is not subject to review on appeal, has no application where the rightful judgment depends upon a proper construction of a deed, and that construction involves only questions of law, and is not dependent upon the finding of facts.

Appeal from Grundy Circuit Court.—*Hon. L. B. Woods,*
Judge.

REVERSED AND REMANDED (*with directions*).

*Platt Hubbell* and *George H. Hubbell* for appellants.

(1)   Henry Willis and William T. Willis were each entitled to one-half of the life estate, and each of their children surviving them is entitled to an equal part of the share of their ancestor   *per stirpes.*   18 C. J. 329; Treadwell v. Bulkley, 4 Am. Dec. 227;   Charles v. White, 214 Mo. 196;   Long v. McDougald's Admr., 23 Ala. 413; Smith v. Alderson, 116 Va. 986.   (2)   The granting clause of this deed  conveys a fee simple title, except for the modification contained in the subsequent paragraphs of the deed.   Waldemeyer v. Loebig, 222 Mo. 552;   4 Words & Phrases, p. 3157 (1st Series);   2 Words & Phrases, p. 779 (2nd Series);   R. S. 1919, sec. 2180.   "It is familiar doctrine that the construction of deeds must be upon the entire instrument, with the view to give, if possible, meaning and effect to each and every part of it.   Bean v. Kenmuir, 86 Mo. 669;   18 C. J. 252, 260;   Tesson v. Newman, 62 Mo. 202;   Utter v. Sidman, 170 Mo. 294, 300; McCullock v. Holmes, 111 Mo. 447;   R. S. 1919, sec. 2180. Applicable provisions of Missouri statutes: R. S. 1909, pp. 1027, 1028, 1029;   R. S. 1919, secs. 2265, 2269, 2271, 2273; R. S. 1855, p. 355 et seq.; R. S. 1865, p. 442.   (3) Grammar and punctuation have little, if anything, to do with the interpretation of any deed.   Martindale on Conveyancing, pp. 81, 82.   "The first words in a deed" have no more weight than the middle words or the last words, or any other words or parts of the deed.   Utter v. Sidman, 170 Mo. 294.   "Respectively" means relatively, as relating to each other.   Respectively does not mean as "set against the other."   Webster's New Int. Dict. of 1920, p. 1817; 7 Words & Phrases, p. 6177 (1st Series). This deed created contingent remainders in the heirs of Henry Willis and in the heirs of William T. Willis.   1 Tiffany on Real Property, pp. 486, 487.   A remainder is contingent if the event on which it is to take effect is

contingent, or if at the time of creating the estate the person who is to take is not ascertained. Sullivan v. Garesche, 229 Mo. 496. The ancient learning and historical development of conveyance by deed, has been ably presented by the general text-book writers. 9 Am. & Eng. Encyc. Law, pp. 94, 137; 18 C. J. 172. The Missouri statutes and decisions have rendered the old learning obsolete, except that it may serve to illustrate the correct method of legal reasoning. Deed from Henry Willis to plaintiffs did not create a merger of the life estate and the remainder, for the reason that William T. Willis did not join in that conveyance. Tiedeman on Real Property, p. 40, sec. 63; 9 Am. & Eng. Encyc. Law, p. 162. (4) A case in which there are four life-tenants, the children of each life-tenant taking the share of the deceased life-tenant, as remaindermen. Jeffries v. Butler, 56 S. W. 980, 108 Ky. 531; 18 C. J. pp. 306, 307, 310, 311. "The intent and purpose of this conveyance" is to be sought by the Supreme Court. The surrounding circumstances may be considered in interpreting the deed. 18 C. J. 311; Ashbaugh v. Ashbaugh, 273 Mo. 360; Elsea v. Smith, 273 Mo. 412; Tiedeman on Real Prop., pp. 156 to 160, 311. (5) The fact that Henry Willis paid the consideration for this deed, tends to support the interpretation that he and his heirs took no less interest than William T. Willis and his heirs. Tennison v. Walker, 190 S. W. 12. Appellee's possession did not become adverse to appellants until the death of both of the life tenants. Myers v. Viverett, 70 So. 451; Hauser v. Murray, 256 Mo. 58, 86; Barnes v. Keys, 127 Pac. 261; Coulson v. La Plant, 196 S. W. 1144; Nichols v. Hobbs, 197 S. W. 258; Herndon v. Yates, 194 S. W. 46; R. S. 1919, sec. 1970; Armor v. Frey, 253 Mo. 474; Matlack v. Kline, 190 S. W. 408. (6) Parol evidence is not admissible on the question of the interpretation or meaning of this deed. Lemon v. Lemon, 273 Mo. 493; R. S. 1909, p. 994; R. S. 1919, sec. 2174; Tapley v. Ogle, 162 Mo. 197; Hunter v. Patterson, 142 Mo. 318. (7) Neither limitations nor laches can be invoked against plaintiffs, for the reason that their cause

of action did not accrue until after the death of both life tenants. Hall v. French, 165 Mo. 442; 10 Am. & Eng. Encyc. Law, p. 517; Hull v. Cavanaugh, 6 Mo. App. 147; Tiedeman on Real Property, p. 41, sec. 65.

*A. G. Knight, H. E. Thompson* and *Lesley P. Robinson* for respondents.

(1) In the interpretation of deeds, the proper construction of the instrument must be sought from the entire deed, and not merely from any particular part of it. The intent of the parties is the pole star to guide courts to a correct interpretation. Buxton v. Kroeger, 219 Mo. 245; Meyer v. Christopher, 176 Mo. 594; Williamson v. Brown, 195 Mo. 336; McCullock v. Holmes, 111 Mo. 445; Utter v. Sidman, 170 Mo. 284; Howell v. Sherwood, 242 Mo. 536; Eckle v. Ryland, 256 Mo. 440; Warne v. Sarge, 258 Mo. 162. And the cast-iron rule, that formerly obtained in this State, in case of repugnancy, that the first words in a deed and the last words in a will shall prevail, no longer obtains. Utter v. Sidman, 170 Mo. 284; Johnson v. Calvert, 260 Mo. 452; Hunter v. Patterson, 142 Mo. 310; Walton v. Drumtree, 152 Mo. 489; Tennison v. Walker, 190 S. W. 9; 18 Corpus Juris, p. 256. (2) "Or" is used to mark an alternative and present a choice, implies an election of one of two things. 29 Cyc. 1502; Bouvier's Law Dictionary; Eckle v. Ryland, 256 Mo. 449. (3) "Respectively" means singly or severally considered. 34 Cyc. 1671; Alsop v. Russell, 38 Conn. 99, 36 L. R. A. 812; Wolf v. Lake Erie, 45 N. E. 708; Walson v. Foxon, 2 East. 36, 41. (4) Where a deed is fairly susceptible of different construction, the court may ascertain the situation and circumstances of the parties to determine the meaning of the language used. Warne v. Sarge, 258 Mo. 162; Elsea v. Smith, 273 Mo. 412; Bernero v. McFarland, 134 Mo. App. 290; Long v. Tims, 107 Mo. 512; Wolf v. Dyer, 95 Mo. 545; Hardy v. Matthews, 38 Mo. 121; Carter v. Foster, 145 Mo. 383; 2 Devlin on Real Estate (3 Ed.), p. 1526; 18 C. J. p. 260, 311; Tiedeman

on Real Property, 156-159. (5) In the interpretation of deeds the construction and meaning given to the instrument, by the parties in interest, may be shown in evidence. Carter v. Foster, 145 Mo. 383; Scott v. Scott, 95 Mo. 318; Patterson v. Camden, 25 Mo. 22; Tennison v. Walker, 190 S. W. 14; 2 Devlin on Real Estate (3 Ed.) p. 383. (6) Oral statements made by those in possession or in interest, are admissible as verbal acts to characterize the possession. Heynbrock v. Hormann, 256 Mo. 21; Akins v. Adams, 256 Mo. 2; Allen v. Morris, 244 Mo. 362; Scott v. Scott, 95 Mo. 318; Tennison v. Walker, 190 S. W. 14; Patterson v. Camden, 25 Mo. 22; Dunlap v. Griffith, 146 Mo. 283; Mississippi Co. v. Vowels, 101 Mo. 225; Topper v. Perry, 197 Mo. 542; Hinters v. Hinters, 114 Mo. 26; 3 Elliott on Evidence, secs. 2195 to 2199. Henry Willis told Blair Welch that "it was Willie's land" and said he "managed it for Willie." And Henry told old Fulkerson that "I must soon get out of it what I get right away" for "Willie and his heirs will soon get it." (7) When William T. Willis reached twenty-one years of age he was then vested with a life estate in the real estate in question. R. S. 1919, secs. 2267, 2269; Waddel v. Frazier, 245 Mo. 400; Chiles v. Bartleson, 21 Mo. 344; Riggins v. McClellan, 28 Mo. 23; Lamert v. Lidwell, 62 Mo. 188; Godman v. Simmons, 113 Mo. 122; Emmerson v. Hughes, 110 Mo. 627; Charles v. Pickens, 214 Mo. 212. (8) On the death of William T. Willis in 1918 his heirs or grantees took the remainder in said estate in fee. A remainder being a remnant of an estate in land after the termination of a particular estate—in this case the life estate of William T. Willis, R. S. 1919, secs. 2267, 2269; Dickerson v. Dickerson, 211 Mo. 488; Chew v. Keller, 100 Mo. 362; Buxton v. Kroeger, 219 Mo. 224; Sullivan v. Garesche, 229 Mo. 505; Eckle v. Ryland, 256 Mo. 450; 4th Kent's Com. (11 Ed.) pp. 197, 209. (9) The plaintiffs in this action are barred by the Statute of Limitation, even if they were ever seized with an interest in the lands. R. S. 1919, sec. 1305. Rutter v. Carothers, 223 Mo. 647; Gray v. Yates, 67 Mo. 601; Graham v. Ketchum, 192 Mo.

15; Ogle v. Hignet, 161 Mo. 47; Hall v. French, 165 Mo. 439; King v. Theis, 272 Mo. 416; Schneiderheinze v. Berg, 269 Mo. 270; DeHarte v. Edmonds, 200 Mo. 246. (10) Defendant and his grantors have been in the open, notorious, peaceable, adverse, exclusive possession of the lands in question claiming title to the same for more than twenty-one years, and holding adversely to plaintiffs, and is the lawful owner by adverse possession. Whitaker v. Whitaker, 157 Mo. 342; Whitaker v. Whitaker, 175 Mo. 1; Gray v. Ward, 234 Mo. 297; Hinters v. Hinters, 114 Mo. 26; Robinson v. Allison, 192 Mo. 366; Heynbrock v. Hormann, 256 Mo. 21; Frame v. Humphreys, 164 Mo. 344; State v. Taylor, 111 Mo. 448; Girard v. St. Louis Car Wheel Co., 125 Mo. 385. (11) When Henry Willis conveyed all his right, title, and interest in said lands to his heirs, the plaintiffs, September 18, 1895, said estate instantly merged into their alleged fee if they had such fee, and if they ever had any right to possession it occurred on that date, and they could not wait till the death of the life tenant. Whitaker v. Whitaker, 157 Mo. 342; Nickey v. Leader, 235 Mo. 43; Missenheimer v. Amos, 221 Mo. 371; Swope v. Ward, 185 Mo. 316; Boyce v. Railroad, 169 Mo. 593; Tiedeman on Real Property (Enl. Ed.) secs. 63, 421; Devlin on Real Prop. (3 Ed.) sec. 1318. (12) Without regard to the Statute of Limitations plaintiffs should be barred by laches, which is held to be a wholesome law, received with favor to prevent the resurrection of stale titles and the spying out from the records ancient and abandoned rights. Shelton v. Horrell, 232 Mo. 375; Marshall v. Hill, 246 Mo. 25; Troll v. St. Louis, 257 Mo. 660; Rutter v. Carothers, 223 Mo. 640; Adams v. Cossom, 228 Mo. 566; Walther v. Null, 233 Mo. 104; Leslie v. Carter, 240 Mo. 552. Laches is a question of fact and does not have to be pleaded. Stephens v. Smith, 189 Mo. 446; Dexter v. McDonald, 196 Mo. 373; Bliss on Code Pleading, sec. 686. (13) The determination of the trial court as to the question of facts is conclusive on appeal. Morris v. Bomer, 195 Mo. 535; Charles v. Pickens, 112 S. W. 555; Glade v. Milling Co., 129 Mo. App. 443;

Thompson v. Stilwell, 253 Mo. 89; Strothers v. Barrow, 246 Mo. 241; Dolphin v. Klann, 246 Mo. 477; Foster v. Byrd, 119 Mo. App. 168.

WALKER, J. —These are suits in ejectment and to quiet title, brought in the Circuit Court of Grundy County. The pleadings and evidence are the same in all of these cases, except that each involves different tracts of land. It was stipulated that the second and third cases should be heard and submitted with the first, the decision in the latter to control in the disposition of the other two, both in the trial court and upon appeal.

On February 23, 1866, Thomas Willis and Elizabeth, his wife, were the owners in fee of all of the land described in the three suits. On that day they conveyed the same by warranty deed to Henry Willis and William T. Willis. The language of the conveyance, excepting the description of the land and the acknowledgment and signatures of the grantors, is as follows:

"Know all men by these presents, that we, Thomas Willis and Elizabeth Willis, his wife, of the County of Franklin in the State of Ohio, in consideration of the sum of two thousand dollars, to us in hand paid by Henry Willis and William T. Willis of the County of Grundy in the State of Missouri, have bargained and sold and do hereby grant, bargain, sell and convey unto the said Henry Willis and William T. Willis, the following described premises, situated in County of Grundy in the State of Missouri and bounded and described as follows, to-wit:" Then follows a description of the land, which is omitted.

"Reference may be had to a deed from Wm. Willis and wife to the said Thomas Willis, dated June 9, 1857, duly recorded in the Recorder's office of said County of Grundy in Deed Book—page 221.

"To the said Henry Willis, until the said William T. Willis shall be of lawful age, or until his death, if he shall die before the said William T. Willis.

"And to the said William T. Willis for and during his natural life, and in the case the said William T. Willis should die as a minor, the said Henry Willis, if he survives him, shall have the free and undisturbed use of the conveyed premises for and during his natural life.

"The intent and purpose of this conveyance being to vest a life estate in and to said premises, partly in the said Henry Willis and partly in the said William T. Willis, and the remainder of said estate in the heirs of the said Henry Willis or the heirs of the said William T. Willis, or their heirs and assigns of such heirs forever.

"To have and to hold said premises with their appurtenances to the said Henry Willis and William T. Willis as above mentioned, and the residue, remainder and reversions therein and thereof to the heirs of the same respectively and their heirs and assigns of such heirs forever.

"And the said Thomas Willis and wife do hereby covenant with the said Henry Willis and William T. Willis, their heirs and assigns of such heirs that they are lawfully seized of the premises aforesaid, and that the premises are free and clear from all encumbrances whatsoever, and that they will forever warrant and defend the same with the appurtenances unto the said Henry Willis and William T. Willis, their heirs or assigns of such heirs, against the lawful claims of all persons whomsoever.

"And the said Elizabeth Willis, wife of the said Thomas Willis, doth hereby release and convey to the said Henry Willis and William T. Willis, their heirs and assigns of such heirs forever, her right of dower and dower estate in said premises."

Thomas Willis and his wife are the common source of title, and a construction of their deed constitutes the vexed question in this controversy.

Henry Willis died in November, 1898; William T. Willis, in January, 1918.

The plaintiffs are the children of Henry Willis. They base their claim to title on the deed from Thomas Willis

and wife and as grantees and purchasers under and by virtue of said deed.    .

All of the defendants are the children or grandchildren of William T. Willis, except Lesley P. Robinson and Homer Peery, who are in possession of the land and claim title thereto by mesne conveyances from the heirs of William T. Willis and through court proceedings.

I.   Under a cardinal rule of interpretation we are to look to this instrument itself to ascertain its meaning. Thus considered, if every part of the deed be viewed in the light of the circumstances under which it was made, the intent and purpose of the maker ought not to be difficult of determination. In the application of this rule, if the deed bears on its face evidence of a lack of knowledge on the part of the draftsman of the recognized use and well defined meaning of any words employed therein, their unskillful source and inaccurate use will be recognized, and if possible such a construction will be given to the entire instrument as will best effect the dominant purpose of the maker.· [Tygard v. Hartwell, 204 Mo. l. c. 205; Aldridge v. Aldridge, 202 Mo. l. c. 572; Shepherd v. Anderson, 192 S. W. (Mo.) 952.] This accords with common sense and will best serve the ends of justice.

It is horn-book law that the parts of a deed, as anciently considered, comprised the premises, the *habendum,* the *tenendum,* the *reddendum,* the warranty, and *testimonium.* [Coke Litt. 171; 2 Bl. Com. 295.] While these terms are helpful in determining the relative importance and prevailing effect of one of these over the others, under the language employed in the instrument to be construed, we find in modern cases, under more rational rules of interpretation, a pronounced disposition to so construe the entire deed as to cause form to yield to the evident intention or purpose of the maker. Irrespective, therefore, of the ancient terminology, the necessary constitutents of a valid deed are held to be the names of the parties, the consideration, a description of the property,

the interest or quantity conveyed and the conditions, reservations or covenants, if any there be. In short, if the words employed indicate an intention to transfer the claim, interest or estate of the grantor, this will be sufficient to constitute a deed (Evenson v. Webster, 3 S. D. 382, 44 Am. St. 802) ; or as we said more specifically in Wimpey v. Ledford, 177 S. W. (Mo.) 302, the essentials of a conveyance of real estate are competent parties, sufficient subject-matter or property conveyed, a valid or good consideration, the use of a written or printed form, proper words of conveyance showing an intent to convey and the formal signing, execution and delivery to the grantee. Present these requisites, we look to the entire instrument to determine the estate or interest created. [DePaige v. Douglas, 234 Mo. 78; Waldemeyer v. Loebig, 222 Mo. 540; Stoepler v. Silberberg, 220 Mo. 258; Hubbard v. Whitehead, 221 Mo. 672.]

II. Before construing this deed as a whole under the well-established rule, above referred to, it may not be amiss, by way of contrast, to analyze its provisions severally with a view to determining whether this *Different Clauses.* method of interpretation, which seems to have been adopted in part in the presentation of this case, will enable us in a fair and reasonable manner to ascertain the meaning and purpose of the grantor, and, as a consequence, the character of the interests or estates created.

Standing alone the granting clause creates an estate in fee in Henry Willis and William T. Willis as tenants in common. [Sec. 2180, R. S. 1919; Waldemeyer v. Loebig, 220 Mo. l. c. 552.]

The succeeding clause, however, without more, creates an estate for years in Henry Willis or for life, terminable, in the first instance, upon William T. Willis reaching his majority, and, in the second, upon the latter's death before that of the former.

The next clause, when isolated from the others, creates a life estate in William T. Willis, and if he dies during his minority, Henry Willis is given the free and undisturbed use of the premises during his life.

The meaning of the deed as deduced from the foregoing analysis may be summarized as follows: The creation of a fee; the creation of an estate for years or a life estate; the creation of a life estate in another, but upon his death during minority, the one first invested with a life estate is to have the entire use of the premises during his life. The correctness of these conclusions as to the character of the estates created cannot be gainsaid under this method of analysis. It is evident, however, from the inconsistencies, not to say absurdities, that follow this method, that it is not the correct one; and, hence, does not aid, much less enable, us to ascertain the true intention of the grantor.

III. By a construction of the deed, however, not by piecemeal but as a whole, in conformity with the rule crystalized in many precedents and found, from long experience, best adapted to uniform application, we are enabled to remove whatever seeming inconsistencies and incongruities with which we are confronted in pursuing a different course.

Happily, for clearness of construction and a satisfactory conclusion, it does not become necessary to resort to other than the plain words of the deed, following the clauses above cited, to enable us to determine the
*Intention.* meaning of the instrument and the consequent intention of the grantor. What are these words defining this meaning and declaring this intent? They are that the intent and purpose of the conveyance is to vest a life estate in and to said premises partly in Henry Willis and partly in William T. Willis, and the remainder in the heirs of Henry Willis or the heirs of William T. Willis, or their heirs and assigns forever. Whatever other misuse of words or inaccuracies of expression may have characterized the verbiage of the draftsman of this deed, they are not found in this clause declaratory of the grantor's intention. Thus construed, the seeming fee created by a reading alone of the granting clause is reduced to a life estate in the two grantees, remainder over in fee to

their heirs.   The clause beginning with the words "to the said Henry Willis" until the happening of the condition stated, must, when construed in connection with the clause declaratory of the grantor's intent and purpose, be held to create a life estate in Henry Willis with a right reserved in him to the exclusive use of the premises until William T. Willis reached his majority, or in the event of the latter's death during the life of the former.   This construction finds support not only in the clause expressly creating the estates in these two parties, but in that beginning with the words "and the said William T. Willis," which, after expressly creating a life estate in him, provides, as in the clause creating the life estate in Henry Willis, that the latter shall have the entire use of the premises during his life should William T. Willis die during his minority.

We do not attach much importance to the use of the word "or" in the clause creating the estates in the grantees following the creation of the remainder over in the heirs of Henry Willis, as well as a like use of the same word following the creation of the remainder

Or for And.  in the heirs of William T. Willis.  Such use was evidently a mistake on the part of the draftsman, who, while he encountered   no difficulty in defining the estates created by the grantor, was .in other respects attempting to follow a prescribed form and through inadvertence used the word "or" instead of the word "and."   We are at least authorized in the face of the clearly defined purpose of the deed taken as a whole to thus construe the word misused.   There is no lack of precedents to sustain this conclusion.   Where the question of intent is under consideration and it is evident from the entire context and circumstances of the instrument, "or" may be construed as "and."  [29 Cyc. p. 1505, B, 3, cases under notes 27 and 28; Chicago, B. & Q. R. Co. v. Bartlett, 120 Ill. 603, 11 N. E. 867.]

Viewed from another vantage, it appears from this instrument that at the time it was made Henry Willis had reached his majority and that William T. Willis was

a minor. The use of the word "or," if not an error, was simply an attempt to vest the remainder in the heirs of one of the grantees if the other should die childless.

Under any construction, the use of the last phrase in the clause defining the estates created adds force to our conclusion as to the nature of these estates wherein it provides that the remainders shall vest in "their heirs and assigns of such heirs forever," referring beyond question to the heirs, if such there be, of both grantees.

Furthermore, we find nothing in the succeeding clause of the deed beginning with the words "to have and to hold the premises with their appurtenances to the said Henry Willis and William T. Willis," etc., which in any way runs counter to the construction we have

Habendum.

given this deed. The foregoing quotation, which under the old nomenclature constitutes the introductory phrase to the *habendum*, further provides, in effect, that the residue, remainder and reversions in said lands shall vest in the heirs of the grantees, respectively, and their heirs and assigns forever. This clause is in the usual form except in the use of the word "respectively," and from its own words cannot be construed other than as in harmony with the other portions of the deed, declaratory of a purpose to create life estates in the grantees and in the creation of such estates. We are not without authority in this jurisdiction as to the use, purpose and proper construction of this clause. We said in Utter v Sidman, 170 Mo. 284: "If there be a doubt as to the intention of the parties, the *habendum* clause, which performs the office of defining, qualifying and controlling the granting clause when not in conflict with it, is an important factor in arriving at such intent." The use of the word "respectively" in this clause does not mean, as has been contended, that "one set of the heirs may be set over against the other," but it does mean "as relating to each," or "as each refers or belongs to each in their order." Illustrative of the correctness of these definitions is the ruling of the Supreme Court of Maine in Messer v. Jones, 88 Me. 349, in which it is held that: "Res-

pectively as used in the Act of 1887 providing that in certain cases a child and its issue should inherit from its parents respectively, and from their lineal and collateral kindred, conveys the idea that such child shall inherit in each case from the parent or parents of whom the act has declared him to be an heir and from the kindred of such parent or parents.  That the word was intended to be used in harmony with these definitions is evident from the further language of the clause, which provides not that the residue, remainder and reversions are to the heirs of either of the grantees but to 'their heirs and assigns of such heirs forever.' '"

In addition, the covenants of the grantor further sustain the conclusion we have reached in regard to his intention in making this deed.  This covenant is not made to one but to both of the grantees, their heirs, assigns, etc.; and likewise the title is warranted to both of them and their heirs, etc.

Other Clauses.

Even the relinquishment of the dower of the wife of the grantor is made to both of the grantees and their heirs, etc.  This, if further light is necessary, is illuminative of the meaning of the deed in harmony with what has heretofore been said in regard to same.

IV.  It is contended that where a deed is fairly susceptible of different constructions, the court may ascertain the situation and circumstances of the parties in determining the meaning of the language used.  Under our ruling as to the manifest meaning of the deed, there is no ground for a resort to this alternative.

Situation of Parties.

A brief statement of the facts, however, as disclosed by the record, will not, we believe, but add probative force to our construction of the deed.  The grantor sold to the grantee Henry Willis the land described, for which the latter paid him two thousand dollars.  These parties were brothers.  Henry Willis was then fifty-two years of age, was married and lived in the county where the land was located.  He was in good financial circumstances, being the owner of several hundred acres of land and having

money loaned at interest. The other grantee was a mere boy, eleven years of age. He was not of the Willis blood, but was a son of a sister of Henry Willis's wife, born out of wedlock, and had been taken into the family of Henry Willis at a tender age to be reared and educated, and had been given the name of William T. Willis. Henry Willis, having bought and paid for the land, it is not only a reasonable assumption, in accord with human experience, that it was his purpose, as manifested by the terms of the deed, to invest William T. Willis with the ownership of some property. The latter being an alien to his blood and his future capacity to care for and manage property subject wholly to conjecture, it was in harmony with the prompting of that homely wisdom, which, in lieu of a better term, we call common sense, for Henry Willis, who by his own efforts had risen from poverty to a pecuniary competency, to invest William T. Willis with but a life estate in the land, reserving to himself a like estate with remainders in fee as stated. The after years confirmed the wisdom of this course. William T. Willis proved to be of feeble intellect when measured by the average mentality of other men of like opportunities. This is demonstrated by his being content, upon reaching his majority, to take possession of a poor timbered forty acres of the land described, build a cabin thereon and clear a little garden plot. Every Jack has his Jill, and that he married and begot perchance others of his kind, argues nothing against the limited measure made of his mentality. He was without education and could not read, much less write his name. His principal business in the years of his limited activity was the making of railroad ties, an account of which he kept by cutting notches on a stick. The disposal of this product of his industry was, from his evident incapacity, left to the direction and control of Henry Willis, who exercised the same. The latter's management of William T. Willis's interest in the land or any other business is shown by the testimony of several witnesses. This continued until the death of Henry Willis in 1898, during which time he had posses-

sion of and cultivated the land, except the forty-acre tract, which, under his direction, as stated, was used and occupied by William T. Willis. During all of this time Henry Willis paid the taxes on the entire tract. Seven years thereafter, a fact further illustrative of William T. Willis's mental limitations, despite the plain terms of the deed and the recognized value of the land, he sold the entire tract of one hundred and thirty-seven acres for two hundred dollars, and conveyed same by warranty deed in fee simple to one Samuel Hill.

Whatever seeming irrelevancy to a determination of the meaning of the deed the foregoing facts may present, is removed when the same are concretely applied. Keeping in mind the situation and circumstances of the parties, it is not reasonable to conclude that Henry Willis would have bought and paid for this land and directed that the fee in same be invested in a boy then only eleven years of age, leaving to himself only the right of use and occupancy; but rather that he would, as the deed declares, invest the boy, jointly with himself, with a life estate, leaving the use and occupancy, as the facts show they were exercised or would have been exercised in the presence of average ability on the part of William T. Willis, until the latter reached his majority when, from the nature of their titles, such use was to be in both.

If, in the face of this deed, any deductions from the facts are authorized to be made to determine its meaning, resort must be had largely, if not exclusively, to the testimony concerning the conduct of Henry Willis. This, however, does not render the testimony in regard to the incapacity of William T. Willis wholly irrelevant. It is helpful in showing that his conduct was such as to authorize no conclusion therefrom concerning the manner in which he regarded his title. When he reached his majority, he was content with the use of the forty-acre tract to afford him a shelter, a garden plot and timber from which to make ties. No other desire or purpose was evidenced by him during the life of Henry Willis. After the latter's death, at a complete variance with his former

conduct, he asserts, if his act can be construed as intelligent, sole ownership in and the right to dispose of the entire land by selling and conveying same as stated. The invoking of the rule, therefore, the correctness of which cannot be questioned when the facts authorize its application, that the meaning of a deed may be shown by the construction given to it by the parties in interest, derives no aid from the testimony as to the conduct of William T. Willis.

V. Further than this, the rule as to the admissibility of oral statements of the parties in interest to show acts characterizing possession can have no application here in the presence of the unequivocal terms Oral Statements. of this deed. Such declarations are never admissible to show title, but simply, as was said in Heynbrock v. Hormann, 256 Mo. l. c. 31, to show possession where there is a dispute between owners of adjoining lands as to the boundary line, or to show a claim of adverse possession, as was held in Akins v. Adams, 256 Mo. 2, to indicate the extent of the declarant's claim. No such questions are presented at bar, and the numerous cases cited by respondents to sustain the rule as stated by them are inapplicable.

VI. The plea of the Statute of Limitations is interposed to defeat the claim of the appellants. The interest of the life tenants being undivided and severable only by judicial action, which did not occur, the statute did Limitations. not begin to run against the remaindermen until the death of William T. Willis in 1918. This rule we held to be applicable where one held an interest in fee and for life on the ground that the latter interest being undivided, which although partial, was sufficient to prevent the running of the statute. [Hauser v. Murray, 256 Mo. l. c. 87.] Neither the life tenant nor the grantee of a life estate can claim adversely to the remaindermen, and the Statute of Limitations does not begin to run against the latter until the death of the life

tenant (Waddle v. Frazier, 245 Mo. 391), nor will a remainderman be relieved of his disability because the life tenant has attempted to convey and his grantee claims the fee under this transfer. [Armor v. Frey, 253 Mo. 447.]

The reason for the rule as thus announced is that the remaindermen are ·not entitled to the possession of the land, their right to same being held in abeyance by the intervening life tenancy. Hence, they cannot sue until that estate is terminated (Herndon v. Yates, 194 S. W. (Mo.) 46; Bradley v. Goff, 243 Mo. l. c. 103; Coulson v. La Plant, 196 S. W. (Mo.) l. c. 1147; Nichols v. Hobbs, 197 S. W. (Mo.) l. c. 260), and same does not occur until after the death of both life tenants. (Hall v. French, 165 Mo. l. c. 442; Hull v. Cavanaugh, 6 Mo. App. l. c. 147; Tiedeman on Real Prop. p. 78, sec. 65). We said in Hall v. French, supra, somewhat more forcibly than expressed elsewhere, that: "No court has ever held·that a right can be barred by limitation before the law permits the owner of the right to come into court, for such a decision would be a solecism, a denial of due process of law, for it would not give the party a day in court. If a remainderman came into court before the life estate had terminated, he would be turned out of court because his cause of action had not accrued. If he did not come into court within thirty years from the time the life tenant, or tenant for years, or tenant by the curtesy, went into possession of the qualified estate, he would be turned out of court, because he came in too late, albeit, his right of action had not then accrued. No such construction has ever been or could ever be placed upon Section 4268, Revised Statutes 1899" (now Sec. 1311, R. S. 1919), "and if that section was intended to prescribe any such rule of conduct it would violate the Constitution of Missouri as well as the Constitution of the United States, for it would deprive a person of his property without due process of law— without giving him a day in court."

That the rule applicable to one remainderman is applicable to all does not admit of discussion, much less of question.

The non-applicability of the Statute of Limitations to a case of the character at bar is clearly stated in the ruling of this court in Kohle v. Hobson, 215 Mo. 213. In that case a wife, the owner in fee of certain land, died intestate, leaving eight children as her only heirs. Her husband, who survived her and was the father of these children, held a life estate in the land as tenant by the curtesy. During his life one of the children bought the land at a sale for taxes, and transferred whatever right, title or interest was thus acquired to the defendant Hobson. The life tenant also sold and conveyed his interest in the land to the defendant. Thereafter the latter, at different times, procured deeds to the land from all of the other heirs except the plaintiff, who brought this suit to determine his title to an undivided one-eighth interest in the land. There was a judgment below for the plaintiff. In the discussion of this case, this court said:

"As a general rule, one tenant in common cannot purchase for his own exclusive use and benefit, an interest in real estate which is the common property of himself and others; but when he does so he holds the title thus acquired as the trustee for the use and benefit of his co-tenants, who may compel him to convey to them their respective interests, upon refunding to him the amount expended in the acquisition of the title and costs attending the sale and execution of a deed or deeds to the party or parties interested.

"In Hinters v. Hinters, 114 Mo. l. c. 29, it is said: 'Tenants in common occupy a confidential relation to each other, and because of this relation there is an implied obligation on the part of each to sustain and protect the common title. It is, therefore, a general rule that if a tenant in common buy up an outstanding title or incumbrance, the purchase will be deemed to have been made for the benefit of all co-tenants, the other co-tenants being bound, however, to contribute their respective proportions of the consideration paid for the outstanding title or incumbrance.' [Freeman on Cotenancy and Partition (2 Ed.), secs. 151, 156; Allen v. DeGroodt, 105 Mo. 442.]"

Following this reasoning the court held that when Mrs. Kohle died the land descended to her children, subject to the life tenancy by the curtesy of the husband, whose rights and possession the defendant Hobson acquired by purchase. However, whatever possession or right he acquired under this purchase was not adverse to the claims of the plaintiff or to any of the other children of Mrs. Kohle, it being only for the lifetime of her husband. It was ruled that the defendant held possession under the life tenant, whose possession was never adverse to the remaindermen; and that the defendant occupied the same position as his grantor; that the remaindermen were not entitled to possession, nor could they or the defendant, as their grantee, if he was out of possession, recover it before the life estate had terminated, and the Statute of Limitations could not begin to run against the plaintiff until the life estate had terminated by the death of the life tenant.

VII. Incongruously, the plea of laches is interposed as supplemental to the plea of the Statute of Limitations as a bar to appellants' right of recovery. It is strenuously contended by the respondents that this is an action at law. In the absence of a claim or defense in equity, let this be conceded.

Laches.

The doctrine of laches therefore can have no place here. As was tersely said, in effect, in Kellogg v. Moore, 271 Mo. 1. c. 193: "Laches is peculiarly a defense to an equitable action. It is no bar to a claim made under a legal title. It was expressly so held in Hayes v. Schall, 229 Mo. 1. c. 124. In no case in this State has it been held that laches is a bar to a claim made under a legal right as distinguished from an equitable claim or title.

" 'It is a familiar doctrine that, apart from any question of statutory limitation, courts of equity will discourage laches and delay in the enforcement of rights. The general principle is that nothing can-call forth the court of chancery into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court,

is passive and does nothing. The doctrine is founded principally on the equity maxims, "he who seeks equity must do equity," "he who comes into equity must come with clean hands," and "the laws serve the vigilant, and not those who sleep over their rights," and is based on considerations of public policy. Its object is in general to exact of the complainant fair dealings with his adversary, and the rule was adopted largely because after great lapse of time, from death of parties, loss of papers, death of witnesses, change of title, intervention of equities, or other causes there is danger of doing injustice, and there can be no longer a safe determination of the controversy.' See also 10 R. C. L. 396-408, secs. 143 to 157, inclusive."

In this case the respondents stood on legal as distinguished from equitable claims of title. The defense in such a case is the Statute of Limitations, if applicable under the facts, and the doctrine of laches has no place in the determination of the matter at issue.

VIII. The plea of merger is interposed as an, impelling reason why appellants should have earlier brought this suit.

This contention overlooks or ignores the well-defined meaning of a merger, which is that it applies only when a greater estate and a less coincide and meet in one

Merger. and the same person, in one and the same right, without any intermediate estate. [Phillips v. Jackson, 240 Mo. 310; Curry v. LaFon, 133 Mo. App. 163; Bassett v. O'Brien, 149 Mo. 381.]

It appears that Henry Willis conveyed the lands described to his heirs in 1895, and it is claimed that his life estate then became merged in the fee of the remaindermen and that their right to possession then accrued, and that they could not wait until the death of the other life tenant before asserting their claims.

If there had been a merger, as contended, the grantees in the deed from Henry Willis would have become invested with a fee in the land and entitled to possession. To render this conclusion possible, however, the estates

of the remaindermen must be held to be divisible by the act of the parties, a conclusion we have shown is unauthorized. The result of this contention would be to invest those of the remaindermen to whom the deed had been made by Henry Willis with a fee, although one of the life estates was still in existence, leaving the other remaindermen with estates in expectancy, which would ripen into fee simple titles only upon the death of both life tenants. That the foregoing deductions follow from the nature of the estates involved in attempting to apply the doctrine of merger, there can be no reasonable question. Such deductions, however, will not sustain the doctrine. There is no such a coalescing of a greater estate in a less as is contemplated by this doctrine to authorize its application here. What is meant by a merger is that the entire estates, and not a part of same, be included; and in the cases cited by respondents in support of this contention the entire estates are involved, and not a part of same as at bar. If there was any authority under our rulings for the invoking of a doctrine of merger *pro tanto*, it would be necessary in upholding same to ignore the character of the estates involved and the well-established rights of the owners of same, as well as the rule concerning the application of the Statute of Limitations. There being no merit in the contention, however, it is overruled.

IX. What is said in the foregoing in regard to the doctrine of merger and the rule concerning the Statute of Limitations renders it unnecessary to discuss the rights claimed by respondents to have been acquired by adverse possession. The remaindermen being tenants in common there could be no adverse possession between them, the possession of one being the possession of all. It is scarcely necessary to say that this rule will apply with equal force to the grantees of the remaindermen.

Adverse Possession.

X. It is true in a law case that the finding of the trial court as to the facts, if substantial, is not subject to

review upon appeal. That rule can have no application here. There are no facts of probative force which, when applied in harmony with the rules of construction, will support the finding of the trial court. Besides, a resort to the facts as disclosed in the testimony is not necessary to the determination of this case. An analysis of the deed alone is ample for that purpose. Its construction involves a finding of law and not of fact. That has been given to it and it is adverse to the conclusion reached by the trial court.

*Appellate Practice.*

From all of which it follows that the judgment of the trial court should be and it is hereby reversed and remanded with directions to enter a judgment vesting the title to an undivided one-half of the land in appellants, together with one-half of the rental value of the land at four dollars per acre from January, 1918, the date of the death of William T. Willis.

It is so ordered. *Elder, J.,* concurs; *James T. Blair, C. J.,* concurs in separate opinion, in which *Graves* and *Higbee, JJ.,* concur; *David E. Blair, J.,* dissents in separate opinion; *Woodson, J.,* absent.

JAMES T. BLAIR, C. J. (concurring).—The principal clauses of the deed in question, so far as the issues in this case are concerned, are set out and numbered below. The granting clause is numbered 1 and is as follows:

1. " Do hereby grant, bargain, sell and convey to said Henry Willis and William T. Willis, the following premises" (describing them).

After the description come the paragraphs hereafter set out. The numbers are put in for convenience in reference.

2. " To the said Henry Willis until the said William T. Willis shall be of lawful age, or until his" (Henry Willis's) "death if he shall die before the said William T. Willis" (shall attain his majority).

3. "And to the said William T. Willis" (if he shall attain his majority or—perhaps—if Henry shall die be-

fore that time) "for and during his natural life, and in the case the said William T. Willis shall die as a minor, the said Henry T. Willis, if he survives him, shall have the free and undisturbed use of the hereby conveyed premises for and during his natural life."

4.  "The intent and purpose of this conveyance being to vest a life estate in and to said premises, partly in the said Henry Willis and partly in the said William T. Willis, and the remainder of said estate in the heirs of the said Henry Willis or the heirs of the said William T. Willis, or their heirs and *assigns of such heirs* forever."

5.  "To have and to hold the said premises with their appurtenances to the said Henry Willis and William T. Willis as above mentioned and the residue, remainder and reversion therein and thereof to the heirs of the same respectively and their heirs and *assigns of such heirs* forever."

6.  "And the said Thomas Willis and wife do hereby covenant with the said Henry Willis and William T. Willis, their heirs *and assigns of such heirs* that they are lawfully seized of the premises   .   .   .   and that they will forever warrant and defend the same with the appurtenances unto the said Henry Willis and William T. Willis, their heirs *or assigns of such heirs* against the lawful," etc.

7.  "And the said Elizabeth Willis doth hereby release and convey to the said Henry Willis and William T. Willis their heirs *and assigns of such heirs* forever, her right of dower." etc.

What is the meaning of the deed? Henry lived until after William attained his majority, and William survived Henry.  Appellants are children of Henry.  Respondent Robinson is the grantee of the children and grandchildren of William.

Appellants claim half the fee.  Respondents claim, and the trial court found, that "under the terms and conditions of said deed, the said William T. Willis, on reaching his majority, or the age of twenty-one years,

took a life estate in said premises, with remainder to his heirs,'' as the answer pleads it. The language of the court's finding is that "the said Henry Willis, by said deed, took a conditional life estate in the lands described in plaintiffs' petition during the minority of William T. Willis; and that when William T. Willis reached the age of twenty-one years, the entire life estate in all the lands described in plaintiffs' petition vested in him, the said William T. Willis, with remainder in fee simple to the heirs of said William T. Willis.'' The trial court delivered an oral opinion in which he set forth the reasoning which led him to this conclusion. He held that "the intent of the deed . . . was to convey the land; that is the conveying it to Henry Willis a life estate in it—until William T. Willis arrived at the age of twenty-one or his majority; and the court holds that under that deed the intent of it was that when William T. Willis arrived at his majority then Henry Willis had no further interest in it.'' The court said he "arrived at that conclusion from a study of the conditions of the deed itself. Take the first clause" (or paragraph 2) "of it: 'To the said Henry Willis until the said William T. Willis shall be of lawful age.' There's a complete sentence, and of clear meaning; says it *conveys the land* to Henry Willis until William T. Willis arrives at lawful age. Isn't any guess work about what that sentence means; that is clear, clean cut, straight English and is readily understood.''

This contains the kernel of respondents' contention as appears from the brief. It is apparent the court began its work of construction with paragraph 2 as numbered above. For reviewing this conclusion of the trial court and position of respondents' counsel the deed furnishes the principal, if not the sole, material. The several pertinent paragraphs may be considered in the order in which the deed presents them. Paragraph 1, if considered alone, very simply conveys the land to Henry and William T. Willis. The words of this paragraph, had they not been qualified, would have constituted Henry

and William tenants in common. When the scrivener had finished penning these lines and had written in the description and raised his quill from the paper, Henry and William were tenants in common so far as the meaning of the words used up to that point was concerned. If either Henry or William is to take a less or greater interest than a tenant in common with the other, the effect of the words used in paragraph 1 must be found to be changed in subsequent language used in the deed. That it was not intended to vest a mere tenancy in common in all respects as to the whole estate is entirely clear, as all agree. Subsequent language in the deed does modify the effect of the language used in paragraph 1. The extent of that modification is to be sought in that subsequently used language. The second paragraph begins the work. By that paragraph Henry is given an interest until William, then a minor, attains his majority, or until his, Henry's, death, if he, Henry, shall die before William attains his majority. By the third paragraph, William, in case he lives until he is twenty-one, takes an estate ''for and during his natural life.'' In case William dies before he attains his majority and Henry survives him, Henry ''shall have the free and undisturbed use of the hereby conveyed premises for and during his natural life.'' What language in paragraphs 2 and 3 deals with anything save an estate for years, defeasible upon Henry's death before William becomes twenty-one and life estates? The trial court seems to answer, and counsel for respondents seem to concur, that the words ''to the said Henry T. Willis until the said William T. Willis shall be of lawful age'' *conveyed the land* to Henry. It seems to be reasoned from this that the words conferring a life estate upon William ought to be given a like meaning and effect and that this results in the conclusion that ''when William T. Willis reached his majority then Henry Willis had no further interest in it.'' As a construction of the language of paragraphs 2 and 3 this is not satisfactory. The words ''to the said Henry,'' etc., fix a definite term

(the evidence shows about ten years), defeasible upon condition, during which the land is to be "to the said Henry." The fact that the interest set off to Henry has a definite end prescribed for it in itself shows that the language relied upon by the trial court was not intended to deal with the whole estate. It shows not an intent to "convey the land" in fee to Henry, but an intent to give him its use for a fixed term, subject to be cut short as stated. If there could be any doubt about this, it would be removed by the opening words of paragraph 4. It is necessary to hold that the court's conclusion that the opening words of paragraph 2 "conveyed" the land to Henry, in the sense used by the court, is erroneous. Paragraphs 2 and 3 construct an estate for a limited term in Henry; a life estate in Henry in case William dies during his minority and Henry survives him; and a life estate in William in case he attains his majority. In other words, these paragraphs carve what may be called a defeasible term for years and certain contingent life estates out of the fee. In no respect do they purport to deal with anything more or to dispose of the remainder or remainders in the land. It is to be kept in mind that the language in paragraph 1 was adequate to convey a fee. When the scrivener had finished paragraphs 2 and 3 he had taken up the fee apparently conveyed by the words used in paragraph 1 and had simply created the term and the life estates mentioned. At this point, therefore the remainder in the land is to be considered. Where was it? Paragraph 1 had put the whole in Henry and William, and paragraphs 2 and 3 had taken a term and certain life estates out of them so far as their apparent rights as co-tenants are concerned. Subtract the latter from the former and what is left of the remainder, or remainders is where paragraph 1 put it, i. e. in Henry and William. This is upon the assumption that we are considering the deed as it stood at the completion of paragraph 3. What then was the situation when the work of the scrivener had proceeded only that far? If the deed had gone no further in qualifying the estates,

suppose the scrivener considered what would become of the remainder or remainders in case Henry or William or both of them died. What language in the deed as it then stood before the scrivener, on the hypothesis stated, would have given direction to the course of descent. There was none save the words used in paragraph 1. But that paragraph set up a cotenancy as to all except the estate carved out of the fee by paragraphs 2 and 3. In these circumstances and on the hypothesis stated, i. e. that the estates were to stand as defined in paragraphs 1, 2 and 3, the scrivener would know that in case of Henry's death, his heirs if any, would take one-half the remainder subject to William's life estate; if William died, his heirs, if any, would take one-half the remainder, subject to Henry's right in the use, if any remained. William was an illegitimate child of Henry's sister-in-law. His "heirs" might well fail. He was eleven years of age when the deed was made. Even Henry might die without surviving heirs, particularly if that word be understood to mean children, which, it seems, it must have meant as applied to William. In this situation what would become of one-half the fee if William died childless? Escheat? If both died leaving children, what words in the deed, as thus far construed, would have pointed out what the respective groups would take. As already shown, there is nothing in the deed which would point to the solution of this unless it is the equality first established by clause 1. With these things before him the scrivener undertook, by paragraph 4, to state the purpose of the deed. He says the purpose was to vest a life estate  .   .   .   partly in  .   .   .   Henry  .   .   .   and partly in  .   .   .   William." So far this purpose is in harmony with the construction above given the deed. The use of the land, the "life estate" has been found to have been alternately given Henry and William but not jointly at any time. The right of each was conditional, but, when it arose, exclusive. Next, the scrivener takes up the purpose respecting the remainder interest or interests. " And (to vest) the remainder of

said estate in the heirs of the said Henry Willis or the heirs of the said William T. Willis, or their heirs and assigns of such heirs forever.'' As pointed out, the word heirs of William, because of his illegitimacy, meant his children. The same meaning is to be given the word in the other two clauses of the last quotation, since it is reasonable to think the word would have been used in the same sense in the same sentence. This means, too, children who survive Henry or William, or both. The language quoted is out of harmony with the construction given the deed by the trial court and by respondent. For, if the fee went to Henry's heirs if William died a minor and Henry survived him and Henry then took a life estate, and went to William's heirs in case he attained his majority and took a life estate, then the clause at the end of paragraph 4, ''or their heirs and assigns of such heirs forever,'' is wholly superfluous and never could have had anything upon which to operate. Does not this clause mean that the remainder was intended to go to the children of Henry if William died without surviving children, and to the children of William if Henry died without surviving children, and to the heirs, half and half, of Henry and William if both left surviving children? This accords with the problem before the scrivener when he began to write this paragraph, and gives meaning to all the words used therein and explains the use of the disjunctive ''or.'' It is true that the paragraph does not provide against the death of both Henry and William without either leaving surviving children, but in that case at the time the life estate fell in there would be no takers of the remainder under clause 4, and under clause 1 the remainder would go to the general heirs if such there were, under the usual rule. The same situation would exist in case the word heirs is construed to mean heirs instead of children. This paragraph 4 seems to make it plain that the construction given the deed by the trial court is incorrect. It indicates but does not establish that the construction suggested in the question just asked is the correct one. There is another

paragraph which is to be considered. The *habendum* is "to Henry" and to "William" . . . "as above mentioned," i. e. "provided," and "the residue, remainder and reversion therein and thereof of the heirs of the same respectively and to their heirs and assigns of heirs forever." Again the three clauses appear. As before, the third of these, in so far as it purports to show the vesting of any remainder in "their heirs," is wholly useless and meaningless if the trial court's construction of the deed is adopted. It is contended the word "respectively" is to be construed to mean "alternately" and that it points to the correctness of the court's construction of paragraph 2. The unsoundness of that construction seems to appear so clearly from paragraphs 2 and 3 and the rest of the deed that it is difficult to believe this word "respectively" was intended to have the effect to require a construction so out of harmony with so much of the language used elsewhere in the deed. The word "respectively" does not mean "successively" as used in this case. No succession with respect to the remainder has been established by the deed up to that point. It is clearly applicable to the situation before the scrivener if the hypothesis suggested in connection with the preceding paragraph is adopted. If the word "respectively" is given the meaning "alternately" as contended, then in one case the whole remainder would have gone to Henry's heirs to the exclusion of those of William. In the other (the one before us) the whole would have gone to the heirs of William to the exclusion of those of Henry. In no case could it have gone to "their heirs," as several times provided. Further, on the trial court's construction, if William had attained twenty-one and had died without heirs (his illegitimacy kept in mind) would not the entire remainder have escheated? This is a possibility, in view of certain of the evidence a probability, which it is hardly to be thought the parties intended by this deed. Yet, the thing was quite probable when the deed was drawn if respondent is right in his construction of it.

It is clear the construction given the deed is not a correct one. It is reasonably clear that the one indicated above as correct is the true construction. The statute of limitations could not run during the life tenancy of William, and no merger of the fee and life tenancy of William could be effected by a deed executed by Henry. Laches is not in this case.

The judgment should be reversed and the cause remanded with directions to enter judgment declaring appellants entitled to an undivided one-half interest in the land, and to proceed as directed in the majority opinion. *Graves* and *Higbee, JJ.,* concur herewith.

DAVID E. BLAIR, J. (dissenting).—I am unable to concur in the conclusion reached in the majority opinion, and therefore respectfully dissent.

The deed in controversy is sufficiently set out in the majority opinion and it is unnecessary to set it out herein more fully. An analysis of the deed as a whole has convinced me that it conveyed to Henry Willis an estate conditionally limited in duration to the minority of William T. Willis and subject to termination sooner in the event that Henry Willis died before William T. Willis reached his majority. In the event William T. Willis died before reaching his majority and Henry Willis was then living, Henry Willis took a life estate in the lands conveyed, with remainder in fee in the heirs of Henry Willis. In case William T. Willis reached his majority or Henry Willis died prior to that time, William T. Willis took a life estate with vested remainder in fee in his heirs. In my opinion there is no sufficient reason to be found in the deed for the conclusion that, after the death of both Henry Willis and William T. Willis (a contingency that happened before the filing of these suits), the remainder in fee went half to the heirs of Henry Willis and half to the heirs of William T. Willis.

It appears to me the conclusion I have reached cannot be avoided if full force is given to the entire instrument. The deed provides, "To the said Henry Willis, until the

said William T. Willis shall be of lawful age, or until his death, if he shall die before the said William T. Willis." The first clause of this sentence conveys an estate to Henry Willis until William T. Willis arrives at his majority, an estate for a limited term just as much as if the exact date had been stated when William T. Willis would arrive at his majority or the date of the death of Henry Willis during the minority of William T. Willis had been predicted and that date fixed as the termination of the estate of Henry Willis.  To say that the last clause means that Henry Willis had an estate in said land until his death, regardless of whether William T. Willis reached his majority prior to that time, is to render meaningless the words "until the said William T. Willis shall be of lawful age." This sentence should be construed to read thus: "To the said Henry Willis, until the said William T. Willis shall be of lawful age, or until his death (Henry Willis's death), if he shall die  before the said William T. Willis (said William T. Willis not being of lawful age at that time.)"  The portions put in parentheses are my own.   William T. Willis attained his majority while Henry Willis was still living and life estate then vested in William T. Willis with remainder in his heirs.

Unless this construction is adopted, no meaning whatever can be given to the succeeding clause "and in the case the said William T. Willis *should die as a minor,* the said Henry Willis, *if he survives him,* shall have the free and undisturbed use of the hereby conveyed premises for and during his natural life." (Italics my own.)   In case William T. Willis reached his majority while Henry Willis was still living, we would have this situation: Life estate in William T. Willis with *contingent* remainder in fee in his heirs, subject to be defeated by the death of William T. Willis during the lifetime of Henry Willis, in which event the title would vest in Henry Willis for life with remainder in the heirs of Henry Willis.   In other words, we might have this situation:  Estate for years in Henry Willis at the termination of which an estate for life would vest in William T. Willis and, at his death, life

estate in Henry Willis with remainder in the heirs of Henry Willis. This construction would render absolutely unnecessary and useless the subsequent clause making provision for remainder in the heirs of William T. Willis at the termination of his life estate. Such clearly was not the intent of grantor as gathered from the entire instrument. If Henry Willis took a life estate at all, it commenced at the termination of his estate for a term of years at the death of William T. Willis *within the period of his minority* and not otherwise.

That this is the proper construction of the deed is further evidenced by the language of succeeding clauses wherein alternate provisions are made by the use of the words "or" and "respectively." When once the life estate of William T. Willis vested, both Henry Willis and his heirs lost all further right, title and interest in the lands conveyed in the deed. The only contingency which would extend the estate of Henry Willis for a term of years into a life estate with remainder in *his* heirs was the death of William T. Willis "as a minor." This contingency did not happen and when William T. Willis reached his majority he took a life estate in the premises conveyed with vested remainder in his heirs in *all* the lands conveyed.

It is suggested that the deed in question conveyed the fee to Henry Willis and William T. Willis as tenants in common, out of which estate were carved an estate for a term of years (with possibility of life estate) to Henry Willis and afterwards an estate for life in William T. Willis, if he attained his majority, and that, after the termination of the life estate, the heirs of the tenants in common took the lands. Sufficient answer to this suggestion is found in the language of the deed itself, to the effect that the intent and purpose of the conveyance is to vest a life estate partly in Henry Willis and partly in William T. Willis and the remainder, etc. This shows conclusively that nothing more than a life estate was ever intended to be vested in either Henry or William and completely destroys any suggestion to the contrary to be gathered from the first clause of the deed.

It may also be suggested that, as William T. Willis was an illegitimate child, he might reach his majority and die childless and therefore have no heirs and the lands would escheat. Section 311, Revised Statutes 1919 (which has subsequently been repealed and re-enacted, Laws 1921, p. 118), reads as follows: "Bastards shall be capable of inheriting and transmitting inheritance on the part of their mother, *and such mother may inherit from her bastard child or children,* in like manner as if they had been lawfully begotten of her." The words I have underscored were added in the General Statutes of 1865, and apparently did not take effect until after the date of the deed under consideration, which was dated February 23, 1866. Such words were no doubt added to the section as the legislative answer to the decision of this court in Bent's Admr. v. St. Vrain, 30 Mo. 268, handed down at the March term, 1860, which held that a mother could not inherit from her illegitimate child and the estate escheated to the State. Even if it be true that, under the law in force at the time the deed was executed, William T. Willis could have had no heirs except the heirs of his body, such fact cannot be controlling as against the plain language of the deed as it presents itself for construction. The fact that, in the event William died without children after attaining his majority, the estate would escheat, might have been a sound reason why the deed should not have been so written as to subject the estate to such possibility, but is no reason for construing the deed when it was so written otherwise than as written.

The judgment in all three cases should be affirmed.